```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3  STEWART ABRAMSON, et al,

4          Plaintiffs,
                                          Civil Action
5      vs.
                                        No. 18-615
6  AGENTRA, LLC, et al,

7          Defendants.
   _____

8

9

10     Transcript of MOTION HEARING Proceedings on January 28,
   2021, United States District Court, Pittsburgh,
11 Pennsylvania, before The Hon. Patricia L. Dodge, United
   States Magistrate Judge.

12

13

14 APPEARANCES:

15 For the Plaintiffs:      Anthony I. Paronich, Esq.

16
   For the Defendants:      William S. Richmond, Esq.
17

18 For the Intervenor:      Patrick H. Peluso, Esq.

19

20
   Court Reporter:          Amanda M. Williamson, RMR, CRR
21                          6260 Joseph F. Weis Jr. US Courthouse
                            Pittsburgh, PA  15219
22                          (412) 600-6607

23

24 Proceedings recorded by mechanical stenography; transcript
   produced by computer-aided transcription
25
```

```
 1                    P R O C E E D I N G S

 2            (Proceedings held via Zoom; January 28, 2021.)

 3            THE COURT:  Good morning.  We are here today on

 4   plaintiff's motion for final approval of a class action

 5   settlement in the matter of Abramson versus Agentra at

 6   Docket 18-615.  Would counsel enter their appearances,

 7   please.

 8            MR. PARONICH:  Good morning, Your Honor.  This is

 9   Anthony Paronich, counsel for class plaintiffs and the

10   settlement class.

11            THE COURT:  Good morning.

12            MR. RICHMOND:  Your Honor, William Richmond,

13   counsel for Agentra, LLC.

14            MR. PELUSO:  Good morning, Your Honor.  Patrick

15   Peluso on behalf of the intervenor, Monica Abboud.

16            THE COURT:  All right.  Then we're ready to

17   proceed.  I just want to remind everyone that because we are

18   doing this via a video conference and we have a court

19   reporter, who I'm sure wants to take down everything

20   properly, just remember that there is sometimes a short

21   delay when we're speaking; and I would ask everyone just to

22   pause and allow everyone to finish what they have to say.

23            In addition to that, if you can just make sure you

24   speak up and speak clearly so that our court reporter can

25   hear you and we make sure that everything is recorded
```

1   properly.

2           So we're here today to determine whether a

3   settlement class should be certified and whether the

4   proposed settlement is fair, reasonable, and adequate.  So

5   with that, Mr. Paronich, are you prepared to proceed?

6               MR. PARONICH:  I am, Your Honor.

7               THE COURT:  All right.  Please feel free to do so.

8               MR. PARONICH:  Thank you.  After a dispositive

9   motion practice, the completion of a discovery period, a

10  mediation, the parties reached a settlement in this TCPA

11  class action that would provide a release for a portion of

12  Agentra's liability for violations of telemarketing law.

13          Notably, and as this Court may recall, the

14  plaintiffs had to file a motion to enforce the settlement

15  agreement, which this Court granted after an evidentiary

16  hearing.

17          In addition to the remedial relief necessary under

18  the agreement, the settlement establishes a nonreversionary

19  $275,000 settlement fund to release the liability of Agentra

20  for calls made to the plaintiffs and calls made by or on

21  behalf of a series of specified agents.

22          But notably, Your Honor, and I'm sure this will

23  come up a series of times today, that release is explicitly

24  limited to the 19,863 individuals that actually purchased

25  Agentra policies as a result of the telemarketing calls.

1     This is in contrast to the many millions of calls

2   to individuals that were made that resulted in those

3   purchases.  And I think some background here would be

4   appropriate and helpful to the Court.

5     Through discovery, the plaintiffs learned that

6   calls made to sell Agentra policies are often made by

7   telemarketing call centers that work with lead generators,

8   and those lead generators work with vendors that have a

9   relationship with Agentra insurance agents; and those agents

10  sign independent contractor agreements with Agentra.  In

11  other words, there's often a series of degrees of separation

12  between the caller and Agentra.

13     If the settlement is approved, claimants will

14  receive between $48.39 and $145.17, depending on how many

15  telephone numbers of theirs were called.  As I'm sure we'll

16  discuss in more detail, there was a single objection.  There

17  was another request for exclusion.  And in contrast, there

18  were no objections from any attorneys general after they

19  received CAFA notice and 2,085 class members took the time

20  to file a claim.

21     As attested in the administrator's affidavit, the

22  notice was successfully delivered to 99.995 percent of class

23  members.  There was also a settlement Web site established

24  that allowed any remaining class members who didn't receive

25  their direct notice to be advised about the settlement.

1        10.59 percent of class members filed claims, and
2   that is more than double what my experience is in TCPA class
3   action settlements where you're typically seeing between 3
4   to 5 percent of a claims rate; and 0.005 of the class
5   members filed an objection or a request for exclusion.
6        The plaintiffs' motion explains in further detail
7   why the settlement satisfies the Girsh factors, but I'll
8   give a summary.  The complexity, expense, and duration of
9   further litigation supports a settlement.  Our firm is one
10  of the few that has taken a TCPA class action through trial;
11  and that case, which is still pending, kind of gives a good
12  road map of what was likely to occur here.
13        In that case, it's the Krakauer versus Dish case
14  explained in our brief.  Class certification was granted in
15  2017.  Since that time -- I'm sorry.  From the class
16  certification motion being filed until the time of trial,
17  there were 45 motions filed.  We received a judgment in the
18  class's favor in 2019.  Following that judgment, there were
19  ten more post-trial motions.
20        The Fourth Circuit affirmed the judgment.  The
21  Supreme Court rejected a petition.  And even as we sit here
22  at the end of January in 2021, the parties are still having
23  fights regarding distributions at the district court level.
24  And the defendant has indicated there will be a second
25  appeal about those distributions.

1        With respect to the next Girsh factors, the

2   reaction of the class members, the settlement has been --

3   the reaction has been positive, as outlined above.

4   Discovery in this case was completed.  During discovery, the

5   plaintiffs filed multiple motions to compel and received

6   thousands of pages of documents related to class member

7   identities and vicarious liability issues.

8        The plaintiffs also issued a series of third-party

9   subpoenas, which is how we were able to explain to the Court

10  those various degrees of separation with respect to the

11  telemarketing calls.

12       Another Girsh factor to be considered are the risks

13  of the case moving forward.  And that's, first, when the

14  agreement was negotiated, the constitutionality of the TCPA,

15  as a whole, was pending before the Supreme Court.

16       Class certification in these cases, you know,

17  frankly, Your Honor, when we're filing an ERISA case or one

18  of the -- an ERISA case is probably the best example.  Class

19  certification is certainly a hurdle there; but far more

20  often than not, it's granted.

21       I don't think anyone appearing on the phone today,

22  including Mr. Peluso, whose firm did successfully get class

23  certification in Texas, I don't think class certification is

24  anything close to guaranteed in these cases.  I think

25  they're often a coin flip at best.  Of course, every case is

1  different with respect to the evidence developed.  But

2  looking at class certification as a whole and TCPA cases,

3  they are far from a forgone conclusion.

4        Furthermore, even though there was an existential

5  threat to the statute pending before the Supreme Court

6  during negotiation, the vicarious liability risks here for

7  the multiple levels of separation between the calling

8  conduct and Agentra was important as an evaluation factor

9  and a risk to the case, because a summary judgment motion

10  was going to be one of the next steps that this Court would

11  have evaluated.

12        With respect to the ability to withstand a greater

13  judgment, the plaintiff did review financial documents

14  Agentra provided and weighed those financial documents

15  against the limited class of settlement that was going to be

16  agreed to and the specific risks of this litigation.

17        The recovery in this settlement is well within the

18  range of TCPA settlements that have received approval, and

19  it includes an amount that exceeds consumer recovery

20  provided by much larger companies.  And the plaintiffs could

21  provide further citations if it would aid the Court, but we

22  do have a string cite in our brief that talks to consumer

23  recovery and settlements from Capital One, Walgreens,

24  Wells Fargo, and Bank of America that provided a smaller

25  recovery than claimants would get here.

1          And as to the last -- or I think one of the last

2    meaningful Girsh factors in dispute here or that could be in

3    dispute here, I don't think the fact that negotiation was

4    done at arm's length can reasonably be questioned.  There is

5    the mediator-supplied affidavit, which is meaningful, but I

6    think the Court needs to look no further than the fact that

7    the plaintiff had to file a motion to enforce the settlement

8    agreement and conduct an evidentiary hearing.

9          With respect to the sole objection that was filed,

10   as indicated earlier, that single objection represents

11   0.005 percent of the class members.  And as Judge Kearney

12   held in the Eastern District of Pennsylvania while approving

13   a TCPA class action settlement over four objections, the

14   Third Circuit has found that objection and opt-out rates of

15   one percent respectively to weigh strongly in favor of

16   settlement; and that was in the Power Home Remodeling case

17   that we cited in our brief.  And, of course, the amount of

18   objections or opt-outs here comes nowhere close to

19   approaching that.

20         With respect to the objection, Ms. Abboud filed her

21   lawsuit with similar allegations to the plaintiffs here.

22   Six months after the plaintiffs in this action filed this

23   lawsuit and while counsel for Ms. Abboud, her current

24   counsel, claimed to have not been aware of this lawsuit

25   until January of 2020, Ms. Abboud's prior or referring

1   counsel contacted our firm and my co-counsel's firm in

2   November of 2018 regarding her potential participation in

3   this lawsuit; and as we indicated, at ECF 137 in my

4   affidavit.  Of course, the filing of this case was also

5   available through a PACER review.  But as to the merits of

6   the objection, itself, Your Honor, they should also be

7   overruled.

8          The fact that the claimants settled the claim at

9   3.67 percent of their potential statutory damages is not a

10  reason to deny the settlement.  As the plaintiffs' brief

11  explains, there are a number of cases that support that and

12  have overruled similar objections, including Judge Kearney

13  approving the settlement in the Power Home case at

14  0.9 percent of damages.

15         Also, with respect to the actual participants in

16  the settlement, they are going to be receiving between 10

17  and 20 percent of their potential statutory damages.  This

18  resolution comes prior to the risks of summary judgment,

19  trial, and appeal.

20         Also, on the next point in the objection, the

21  plaintiffs and I certainly don't object to the Court

22  reviewing the financial documents reviewed by plaintiffs'

23  counsel, but we note that the financial condition of Agentra

24  was one of a series of factors, and I think with good

25  reason, because the financial condition of a company was

1  absolutely a consideration.  In the Ward versus Flagship

2  case that Ms. Abboud cites, that her counsel put before this

3  Court, I think this Court should consider it.

4       However, that case is different for a number of

5  reasons.  First, that case was settled I believe before a

6  responsive pleading was filed, but I know before any sort of

7  meaningful discovery was taken.

8       Furthermore, unlike telemarketing, and in this

9  case, it's about telemarketing solicitation calls, I

10 understand that case to be about debt collection conduct.

11 In the debt collections space in the TCPA, that is often a

12 strict liability statute for the defendant.  That's compared

13 to here, where one of the biggest weaknesses in the case was

14 the vicarious -- is, excuse me, vicarious liability of

15 Agentra.

16      The release provided is also consistent with what

17 has been approved in Pennsylvania Federal Courts in TCPA

18 settlements.  It does not provide anything close to complete

19 TCPA peace of mind for Agentra.

20      Most notably, it's limited to the 19,000

21 individuals included in the settlement, and those are

22 individuals who purchased policies.  That's in contrast to

23 in discovery the millions of records of calls of individuals

24 that -- calls to individuals that were made that could have

25 resulted in Agentra purchases.

1          So I'm not sure what kind of overlap there would be

2   with Ms. Abboud's classes. I think most notably, Ms. Abboud

3   has never been provided to the defendant -- my understanding

4   is to the defendant, but certainly never to the class

5   counsel or the administrator, who would be able to report

6   back to us a list of here are the individuals in our

7   certified classes, so that a comparison could be done,

8   because I just simply don't think there will be much overlap

9   there, especially in light of how broad the classes that

10  were certified in the Northern District of Texas are

11  compared to here, where the class is, again, limited to the

12  19,000 individuals who actually purchased an Agentra policy.

13          So in close, Your Honor, with the fact that

14  plaintiffs had to file a motion to enforce the settlement

15  agreement, the discovery period has long been closed, I

16  simply don't see an avenue for the 2,035 individuals to

17  otherwise recover for their claims other than through the

18  settlement, which they took the time to file a claim because

19  they did want to participate. And of course, they should

20  get the opportunity to do so.

21          Ms. Abboud or the plaintiffs would have no

22  objection to her opting out and continuing to pursue her

23  claims on behalf of her class, which is a lawsuit Ms. Abboud

24  filed after she approached plaintiffs' counsel about joining

25  this lawsuit.

1    The class she has certified is far larger than what

2  the settlement is here, and it shouldn't stand in the way of

3  the settlement.  And I would be, of course, happy to answer

4  any questions that the Court has.

5    THE COURT:  Thank you, Mr. Paronich.  I have one

6  or two evidentiary questions, and that is, do you wish to

7  move into evidence for the purposes of this hearing any of

8  the affidavits or other exhibits that you've referenced

9  either in your motion or here today?

10    MR. PARONICH:  If there's no objection from the

11  other counsel at ECF 137-1, my affidavit, the settlement

12  agreement also on the Court's docket, but if there's no

13  objection from counsel, I think that should be considered by

14  the Court, as well.

15    THE COURT:  There are also -- I know there is a

16  declaration of Mr. Geraci that indicates how notice was

17  provided.  Do you wish to move that into evidence for

18  purposes of this hearing?

19    MR. PARONICH:  Not mentioning that was an

20  oversight, Your Honor, and I appreciate you letting me know.

21  I certainly would, because that does lend support to the

22  success of the notice breach and perhaps most important --

23  one of the important factors is what the recovery will be if

24  the settlement is approved.  So, again, if there's no

25  objection from counsel, the plaintiffs would like to move

1  that into evidence.  Thank you.

2          THE COURT:  Sure.  And then finally, there's also

3  an affidavit that you've included in ECF 145, which is your

4  motion for final approval.  That's your affidavit.  Do you

5  wish to move that into evidence at this time, as well?

6          MR. PARONICH:  Yes.  ECF 137-1 and ECF 145-1,

7  which is both of my affidavits, please, Your Honor.  And if

8  there's no objection from any counsel here, I'll address any

9  of those objections.

10          THE COURT:  Are there any other exhibits before I

11  turn to counsel's position with respect to the exhibits that

12  we've identified?

13          MR. PARONICH:  No, Your Honor.

14          THE COURT:  All right.  Mr. Richmond, is there any

15  objection to the admission of the four exhibits that we have

16  referenced?

17          MR. RICHMOND:  No, Your Honor.

18          THE COURT:  All right.  And, Mr. Peluso, I

19  understand you're objecting to the process here in terms of

20  certification and settlement.  But do you have any objection

21  to those documents being admitted?

22          MR. PELUSO:  No, Your Honor.

23          THE COURT:  All right.  Then the two affidavits at

24  ECF 137-1 and 145-1 are admitted, as well as the settlement

25  agreement and the Geraci affidavit, which is at ECF 145 as

1   Exhibit 1, are all admitted.

2           And, Mr. Paronich, I will have some questions for

3   you, but I'm going to first allow everyone to be heard; and

4   then I have questions for all of you.  So I think in terms

5   of the order, Mr. Richmond, I'm going to turn next to you

6   for anything that you would like to address during the

7   hearing.

8           MR. RICHMOND:  Thank you, Your Honor.  On behalf

9   of Agentra, LLC, there are certainly a few factors and new

10  information and, in fact, new law that continues to develop

11  in the area of the TCPA.  Those considerations and the

12  possibilities of more or less favorable law or facts being

13  developed were a huge factor in just making a decision to

14  ultimately move forward with the settlement.

15          Of course, as Mr. Paronich has pointed out, there

16  was even a considerable battle over whether or not a

17  settlement had been reached.  Before having affirmed the

18  reaching of the settlement, the parties had moved for it in

19  all diligence to complete what is set forth both in the

20  statute and the agreement and the applicable procedures.

21          What's really important here to sum up the

22  supplement that I would have to the points and the facts

23  pointed out by Mr. Paronich about the settlement, aside from

24  the Girsh factors, is a couple of different points.

25          Vicarious liability has been, was, and would

1  continue to be, and is still vigorously contested in this

2  case given that Agentra does not make sales calls.  There

3  are no allegations that Agentra's employees or officers are

4  making these calls, had subagents make these calls, knew

5  that these calls were being made, hired the third or fourth

6  or fifth-degree vendors in other countries who may have been

7  making these kinds of violative calls as alleged.

8        And so those issues are ones that Agentra would

9  gladly go and fight, particularly as the law has continued

10 to change; but it is bound by the settlement that was both

11 reached by the parties and approved by this Court.  And

12 those issues would remain -- and those are issues that most

13 importantly still remain in the Abboud case.

14       And that's why, not to get too folksy, Your Honor,

15 there are times when courts are loathed to let a party get a

16 second or third bite at the apple.  This isn't just a third

17 bite at the apple for the Abboud plaintiff, but it would

18 actually be a third bite of the apple for another person's

19 apple.

20       The reason being that in the Abboud case, the

21 court, in Docket 42 in that matter in it's order on

22 certification, denied Abboud the ability to do further

23 discovery, citing Abboud's procrastination as the reason for

24 not extending the discovery deadline.

25       Abboud, while having sent us a few discovery

1   requests, did not take the adequate action to, for example,

2   take depositions, even of Agentra's corporate designee, and

3   was denied that even in the same motion -- or in the same

4   order that granted certification.  That has created problems

5   for this plaintiff in her Texas case, Abboud.

6          But now they're trying to come into this case.  And

7   the timing is, perhaps, the most important part.  In

8   September -- despite having, under her own admission, known

9   about this case since at least January of 2020, though, it

10  may have been even earlier than that, according to

11  Mr. Paronich, at least January 2020, only a few weeks after

12  the denial of further discovery in Abboud did Abboud choose

13  to intervene in this case.  That was October 28.

14          So in September, discovery was denied in Abboud;

15  and then now, they have finally decided to move into this

16  other case despite the fact that it had been many months of

17  battle over the settlement agreement, and this Court had

18  already made its decision about approving the settlement.

19          The ultimate question here would be whether or not

20  this additional bite should occur in a different case that

21  largely stems, it appears, from failing to do adequate

22  discovery and what would be fatal defects in the Abboud case

23  that still would be subject to motions for summary judgment

24  and other substantial issues on the merits in that

25  particular case.  Whereas, in this particular case, we've

1   already crossed those hurdles and have already moved on.

2          My client would love nothing more than the ability

3   to come in and put more fight into this, especially using

4   new facts of law.  But under the law and facts as stated and

5   under this Court's existing ruling, and particularly under

6   the Girsh factors, this is a settlement that was reached

7   after a long battle under the appropriate considerations and

8   one that should move forward, particularly, not least of

9   which, the factor being how far we've already gotten in the

10  notice and settlement procedure.

11          THE COURT:  All right.  Thank you, Mr. Richmond.

12  I will have some questions for you, as well.  But first, I

13  would like to turn to Mr. Peluso, who is here on behalf of

14  the intervenor, Ms. Abboud.  Welcome, Mr. Peluso.  And you

15  have the floor.

16          MR. PELUSO:  Thank you, Your Honor.  And I don't

17  want to get too lost in the weeds here, but I do want to

18  correct the record a little bit on what Mr. Richmond said

19  there.  He stated inaccurately that we didn't depose

20  Agentra's corporate rep.  That's not true.  That's

21  actually -- the testimony in that deposition is what formed

22  the basis for our motion for more time to conduct more

23  discovery, because the testimony was inconsistent with the

24  written discovery responses that we had received earlier in

25  the case from Agentra.  So we requested more time to chase

1   down those inconsistencies.  So that's neither here nor
2   there for our purposes today.  I just wanted to correct that
3   statement.
4         So as Your Honor is aware, you know, I've been
5   appointed class counsel in the case pending in the Northern
6   District of Texas.  One of the two classes that has been
7   certified includes calls made by two of the agents that are
8   at issue in this settlement; Gabbard and Espinoza.  I
9   believe there's eight or nine other ones.  Two of them are
10  the ones that are at issue in our case.  So, you know, we
11  have a duty to the members of those class -- of our class to
12  ensure that, you know, any settlement reached here is fair,
13  reasonable, and adequate.
14        And I would simply submit that when a defendant
15  puts its financial condition, inability to pay, at issue,
16  class counsel has the duty to verify the accuracy of that
17  claim; and the financial documents that were shared in this
18  case are simply inadequate to do that.
19        I would submit, Your Honor, not to take my word for
20  it, it sounded like Mr. Paronich didn't object to this, but
21  I would certainly ask that the documents that were shared
22  with me and with Mr. Paronich at our separate mediations
23  just be reviewed by Your Honor in camera; and then
24  Your Honor can make up your mind for yourself whether it's
25  adequate -- an adequate representation of the company's

1  financial condition or not.

2         And if not, I would ask that the objection either

3  be sustained or that the Court order the parties to go, you

4  know, back to mediation and, you know, increase the

5  settlement to a point that, you know, more adequately

6  compensates the class and is well within what Agentra can

7  pay.

8         THE COURT:  All right.  Thank you, Mr. Peluso.

9  And I'll have a couple questions for you, as well.  But let

10  me go back to Mr. Paronich and see if I can clarify my

11  understanding about a couple of things.  First of all, can

12  you advise me whether there was any incentive agreement with

13  either of the named plaintiffs?

14         MR. PARONICH:  Your Honor, if I'm understanding

15  the question, part of our final approval motion is we are

16  applying for a $10,000-incentive award for each plaintiff.

17  But in the settlement agreement, just like attorneys fees,

18  that's not -- we don't do what I refer to as clear-sailing

19  provisions where the defendant is not allowed to take any

20  position; and just like our fees, we're applying for those,

21  but don't view -- you know, there certainly will be no

22  appeal if they're reduced or denied.

23         THE COURT:  No.  I understand.  And I think my

24  question, perhaps, wasn't as clear as it could have been.

25  It's whether prior to your settlement there was any

1  agreement with either of the named plaintiffs about the

2  amount that they might receive for being named as

3  plaintiffs.

4       MR. PARONICH:  Certainly not, Your Honor.

5       THE COURT:  All right.  And in your original

6  motion for preliminary approval, you had set the amount at

7  $5,000 for a service award.  I know the final -- the motion

8  for final approval and some of the other documents have the

9  amount at $10,000.  Is there any reason for that that you

10 wanted to articulate to me?

11      MR. PARONICH:  The reason is not adequate, other

12 than the preliminary approval motion was a typographical

13 error that I take responsibility for.

14      THE COURT:  All right.  So did the named

15 plaintiffs purchase Agentra policies?

16      MR. PARONICH:  Yes.  But if I could provide a

17 brief explanation.  When these pre-recorded calls will come

18 in, they will advertise the availability of health insurance

19 products.  And, of course, there are plenty of health

20 insurance providers there.

21      So in order to identify the source of the company

22 that is benefiting from the calls, both plaintiffs -- and I

23 believe Ms. Abboud, as well, because this is one of the only

24 meaningful ways to determine this information -- will

25 engage with the -- they'll press "1" to the recorded

1  message.  They will engage with the telemarketer, who will

2  then transfer them over to a vendor, who will transfer them

3  to an insurance agent; and they will secure that policy.

4  They will cancel it within the contractual period to cancel,

5  and both plaintiffs did that.

6          THE COURT:  Okay.  Understood.  And are the named

7  plaintiffs' claims limited to pre-recorded calls as opposed

8  to the ATDS type of calls?

9          MR. PARONICH:  That's also a good question,

10 Your Honor.  But it requires a little explanation of the

11 statute.  So we only pled pre-recorded calls as a strategy

12 decision.  From my experience in TCPA cases, they're the

13 easiest to prove.  The statute has an ATDS restriction.

14 It's at 227(b) in the statute.  In that same subsection of

15 the TCPA is the ATDS availability.

16          So we could have abandoned our claim for

17 pre-records and focused on ATDS.  But with the Third Circuit

18 ruling in Dominguez on ATDS, the Facebook case before the

19 Supreme Court, and, frankly, just that being a tougher hill

20 to climb, we stuck to the pre-records; but they would have

21 had standing to pursue those and still do.

22          THE COURT:  So I want to turn for a moment to the

23 description of the class that was in my preliminary approval

24 order and was the description that was provided to me by the

25 parties.

1        So as I read that, and, perhaps, I'm reading it in

2  a way that is different than what was intended, and I'm not

3  going to read the whole thing, because we all are familiar

4  with it, but in relevant part, it states, "Regarding the

5  sale of a product offered by Agentra."

6        When I originally took a look at that, it seemed

7  different in several ways from other allegations that I've

8  seen.  First, I know in the notice documents and what you've

9  said in your brief and what we've talked about here today,

10  you're indicating that the class consists of only those

11  individuals who purchased an Agentra policy.  Correct?

12        MR. PARONICH:  That's correct, Your Honor.

13        THE COURT:  And do you read the description of the

14  class as comparable to that or different in some way?  In

15  other words, when it relates to calls regarding the sale of

16  a product, is that a broader class than calls that resulted

17  in the sale of a product?  And I don't want to parse it too

18  much, but I wondered whether there was a distinction there.

19        MR. PARONICH:  I think there is -- I understand

20  the question.  And I think it's important from our

21  perspective, and my papers may fall short on this, there's

22  the class that has been defined; and we're tying that class

23  definition to the experience of an explicit class list

24  that's mentioned in the release.

25        So these 19,800 people, they are being -- they are

described as individuals who had this experience in the

class definition.  But to compile the list of individuals

who make up that class and, perhaps, more importantly are

the only ones subject to the release, we took the

individuals that purchased the policy.  And I hope that

answers the question.

THE COURT:  It does.  So the class list that you

were provided, I assume by Mr. Richmond, the 19,000 or so,

are only those who purchased the policy, not those who were

called?

MR. PARONICH:  And that's exactly right,

Your Honor.  And why I know that to be true for a variety of

reasons is because as we described in our discovery efforts,

part of them were tracking down an individual in Texas who

is the subject of a government action right now for illegal

robo calling; and we received his records of millions of

calls that were made that could have been transferred over

to Agentra eventually.

THE COURT:  Okay.  I know one of the things that

Ms. Abboud mentions in some of her papers is that there is a

distinction between the class that is asserted or alleged in

the Second Amended Complaint and the class that was

conditionally or at least preliminarily certified.  Do you

view that as an issue, and can you explain to me why you

don't?

1      MR. PARONICH:  I think the individuals -- I don't

2  disagree with the characterization, that there is no

3  disputing that this class that was preliminarily approved is

4  different than what was explicitly pled in our complaint.

5  But in terms of the scope of what is being sought, because

6  of limiting it to the individuals who had purchased the

7  policy and limiting the release to these 19,830, it's far

8  narrower than what our discovery efforts -- it's far

9  narrower than what our ambition was, frankly, and our

10 discovery efforts revealed was out there.

11      Just, frankly, we worried about the vicarious

12 liability issues, because I think I have a number of

13 arguments, and I don't know if that makes sense for today,

14 but I did notice in Agentra's response to objection at ECF

15 No. 144, they had, I'm sure, taken a lot of time preparing

16 this flowchart of how the calling works.  And while I would

17 have done what I could on summary judgment, I can't dispute

18 that that is how the call flow worked.  So we went with a

19 much narrower approach even though Mr. Peluso is correct,

20 it's a different definition.

21      THE COURT:  And does the fact that no agents were

22 named in the Second Amended Complaint make a difference from

23 your standpoint?

24      MR. PARONICH:  It doesn't, only because -- it

25 would if I was trying to release the conduct of purported

1  agents for their activities other than with Agentra.  So

2  because our case focused on Agentra and Agentra

3  Insurance-related conduct, naming the agents in there,

4  because we've so limited them, does not present a problem.

5        I think, in fact, this may -- this definition may

6  read a little different than some TCPA class definitions out

7  there.  Frankly, it reads a little different than a number

8  of my TCPA settlement class definitions, but it's because --

9  and it's why I tried to emphasize the point early on, it's

10  because this provides far from peace of mind for Agentra.

11  They have a lot of liability out there.

12        I think Mr. Peluso mentioned there's only potential

13  overlap with a portion of one of the two classes that they

14  have certified.  The millions of calls that we found in

15  discovery, they're not touched by these, other than to the

16  extent there's the overlap with the 19,000 individuals,

17  Your Honor.

18        THE COURT:  Okay.  You mentioned the release.  I

19  want to ask you about that for a moment.  And I'm looking

20  now at a copy of the class action settlement agreement.  And

21  in Paragraph 2, of course, that defines the class.  And

22  we've talked about that a little bit.

23        Turning to the release, which is in Paragraph 5, is

24  that release broader?  In other words, would it release

25  Agentra from more than just the 19,000 individuals who

1  purchased a policy?  And I'm asking about that -- it relates

2  back to my prior question, because as I read the class

3  description, it's people who were called regarding the sale

4  of a product and so on and so forth, which I won't repeat,

5  and then the release -- releases all of the members of the

6  class from, and, again, just paraphrasing, claims arising

7  under the TCPA.  So I would like your position on whether

8  the release is broader and would release individuals beyond

9  those who you've identified in your class list.

10         MR. PARONICH:  No.  And I think it's an important

11  question, and I think the settlement would have major

12  problems if it was releasing people beyond that class list.

13  Our position is that it's absolutely not.  You know, not to

14  reveal too much into the settlement discussions that led to

15  the motion to enforce the settlement agreement, they were --

16  it was an important issue for us.

17         And I think under the current status of the

18  settlement, I know you'll have questions for Agentra, as

19  well, but I think Agentra would agree that here, there's a

20  broad release for telemarketing conduct provided if they're

21  called; but it's related to these 19,000 individuals, and

22  it's related to Agentra only.

23         THE COURT:  But where does it say that in the

24  settlement agreement?  And perhaps it does, but I just want

25  to make sure that I understand whether the release

1  explicitly states that it's limited to those individuals who
2  were sold a product that falls within the class definition
3  as you have described it.
4          MR. PARONICH:  And I think it's because the class
5  definition, in itself, is limited to those 19,000
6  individuals.  In Section 2, we do make an estimate in the
7  settlement agreement because we didn't have all of the
8  documentation yet, that it's 15,000.  But the release is
9  then limited to the individuals in the class; and the
10 individuals in the class, it's just the class list, which is
11 what was delivered to the administrator.
12         THE COURT:  No.  I understand that the numbers,
13 I'm sure, weren't available to you at the time.  I'm just
14 wondering whether a call regarding the sale of a product, as
15 the class is defined, is the same as a call which led to the
16 sale of a product.
17         MR. PARONICH:  And I understand the question,
18 Your Honor.  And from our perspective, because it is limited
19 to the plaintiffs and any member of the class, which we do
20 describe as this list of people, that's how it would be so
21 limited.
22         THE COURT:  Okay.  But the list was not part of
23 the settlement agreement, itself?
24         MR. PARONICH:  The name of the list was not.  But
25 limiting this agreement to the 15,000 individuals, that had

1  been -- the detailed -- and I apologize for just reading,

2  Your Honor.  But it does say the detailed and specific data

3  provided by the settling defendant.  So it is limited to

4  these individuals labeled as 15,000.  It is 19,836 or so.

5         THE COURT:  I'm sorry.  I just want to make sure I

6  understand your position.  So at the time you reached the

7  settlement agreement, at least as I understand it, you

8  didn't have the list.  Obviously, that list had not yet been

9  compiled; correct?

10        MR. PARONICH:  That is correct, Your Honor.

11        THE COURT:  All right.  So when we define who is

12  encompassed within that class, I'm just trying to understand

13  how the actual class definition clearly states -- so that we

14  know who would be released, that it relates to a sale.  And,

15  again, that there was a sale as opposed to a call regarding

16  a sale, if you understand my distinction.

17        MR. PARONICH:  No.  I understand it perfectly.

18  And I think that how we identified the people who are called

19  regarding the sale is by limiting it to the specific data.

20  And how that specific data was compiled was simply taking

21  the sales from these agents.

22        THE COURT:  Understood.  I just want to make sure

23  that in the event that the settlement is approved, that it's

24  crystal clear what the release encompasses and what it

25  doesn't.  And I'm just seeing a bit of a distinction there

1  between the definition of the classes.

2          I have looked at your notice or the notice that

3  went out.  And, certainly, the notice in several places does

4  relate to the settlement providing a cash award to

5  individuals who were sold an Agentra product.  I think that

6  is stated in one part of the notice.

7          In another part, it describes -- and I'm looking at

8  the question of, "Why did I get a notice?"  It talks about

9  the fact that you'll get a notice if somebody called your

10 telephone number to sell an Agentra product.

11         So I certainly understand, and I'm also looking at

12 the claim form, which also talks about the sale of a

13 product.  So I just wanted to get your perspective on

14 whether or not the class definition in your settlement

15 agreement encompasses the sale of a product as opposed to a

16 call about the sale of a product.

17         MR. PARONICH:  And that is our position,

18 Your Honor.  But as you could see from the documents, while

19 we did have to file the motion to enforce the agreement, the

20 notice documents were all negotiated, exchanged, and agreed

21 to by the party within the Court's inherent discretion to

22 slightly alter, without altering the settlement, the

23 definition.  If it was -- if those three words were changed,

24 I wouldn't have an objection to it.  I do get your point.

25         I think because we had a specific list of people we

1  were trying to reach, we explained to them throughout the

2  documents, as Your Honor points out, here is why you fit

3  into the class definition.  With respect to the definition,

4  itself, which can -- it can be long and confusing to a

5  typical consumer, we wanted to make them understand the

6  nature of what the case was about, why they were contacted,

7  and why they're being contacted now.

8           THE COURT:  All right.  And the individuals who

9  received notice were that number that purchased a policy as

10  opposed to some other definition?

11          MR. PARONICH:  That's right, Your Honor.  And

12  it's -- the notice reach in this settlement, 99.995 percent,

13  that's way higher than the Federal Judiciary Center's

14  77-percent recommendation.  It's much higher than what I've

15  typically seen in these cases.

16          And I'm not going to try to take credit for that.

17  I think why that occurred is because when you're purchasing

18  one of these policies, you're providing your own

19  biographical information.

20          This isn't a situation where we have sold or leased

21  data being used to contact people.  So why we were able to

22  contact that high of a number through the notice process,

23  it's because we were using sales of policies.

24          THE COURT:  And this is a list that was provided

25  to you by Agentra?

1    MR. PARONICH:  It was directly provided to the

2 administrator by Agentra, correct.  We had no role in

3 compiling the list.

4    THE COURT:  And with respect to the individual

5 class members, what would each of them be entitled to

6 receive under the TCPA if you were to prevail at a trial?

7    MR. PARONICH:  Yeah.  It's a good question,

8 Your Honor.  So they are entitled to statutory damages at

9 $500 for a negligent violation.  There is the ability to

10 treble that up to $1,500.  That's within the Court's

11 discretion.

12    And in our jury trial, we did get an award of a

13 willfulness finding.  It wasn't easy, but I think one of the

14 major factors that made it so we were able to do it was it

15 was against Dish Network who had, by that time, a 15-year

16 history of government actions filed against it where their

17 agents were continuously being found liable for conduct.

18 But it does allow that.

19    I think we also discussed this a little bit in our

20 papers, but I think it's worth mentioning here, as well,

21 Your Honor.  An unfortunate trend, from my perspective, in

22 the TCPA case law has been as more cases are getting towards

23 trial or summary judgments being awarded is the reduction in

24 damages that courts are finding based on what I would label

25 as good-faith compliance efforts.

1          And from our perspective, there is no good-faith

2     defense under the TCPA.  You're vicariously liable or you're

3     not.  However, with respect to the ability to reduce damages

4     through remittitur, we have seen a number of judgments that

5     have been entered against defendants, I think I cite two or

6     three, in the papers where individuals -- I can remember one

7     that after trial, the reduction was to $10 a call.

8          And I don't want to say that's a number picked out

9     of the sky, because it's not.  But it is the court taking a

10    look at the evidence presented in front of it and just

11    determining that this kind of judgment, which would bankrupt

12    the company otherwise, is more appropriate.  And I've seen

13    that entered a number of times.  I can provide further case

14    law if it would aid the Court.  But I think we cite one or

15    two cases on it.  So there's the statutory damages that no

16    longer seem so statutory.

17          THE COURT:  One final question for you, and that

18    is:  Is there any reason that you believe that regardless of

19    the allegations in the Second Amended Complaint, you're able

20    to negotiate a settlement that may or may not be entirely

21    consistent with how you describe the class in that Second

22    Amended Complaint, if that is understandable?

23          MR. PARONICH:  It is.  I think there's case law

24    that would support it if we did it this way, but we did it.

25    Because we negotiated a narrower class, I feel no issue with

1    it.  I have certainly had settlements approved.

2         Other people, other counsel have had settlements

3    approved under the TCPA and other consumer statutes where

4    you can submit case law about the ability -- the nature of

5    compromise, and bringing complete peace of mind for a nexus

6    of conduct that's related.  Here, we're not proffering that,

7    Your Honor, because we did have a different class

8    definition; but we stuck to something narrower to negotiate.

9         THE COURT:  Okay.  Thank you.  I appreciate your

10   answers to my questions.  Mr. Richmond, let me turn to you.

11   I have several questions for you, as well.  First of all,

12   back to my discussion with Mr. Paronich about the release

13   and the class definition.  Do you have anything that you

14   want to add to his explanation?

15        MR. RICHMOND:  No, Your Honor.  I believe that the

16   Court's reference to the notice documents, themselves,

17   adequately reflects the parties' intent with regards to the

18   scope of the settlement class.  It also does get into the

19   reality of the nature of these calls.

20        Not to get too far into the details, but, you know,

21   Agentra is offering a product as an agent.  It then

22   contracts with agents which are sometimes groups of agents,

23   who may then have subagents.  They are contractors.  They

24   work in various places.  And they may, themselves, have

25   subagents and subagents and subagents.

1              There are certain rules and restrictions that we're

2     allowed to be able to impose upon them both in the industry,

3     itself, at the regulatory level and then at the employment

4     level as it regards to contractors, so the employment law

5     level.

6              But ultimately, what we're discovering and what

7     some of the evidence was that Mr. Paronich found with

8     regards to the gentlemen in Texas is that a few of these

9     agents would decide to hire another third party that was not

10    even an agent to get leads.  And those people would call and

11    say something generic like, "Do you need healthcare?"  Well,

12    they don't mention Agentra, because these agents are

13    actually selling for multiple companies at the same time.

14             And one of the issues that's avoided by the

15    settlement and one that I would have liked to bring in this

16    case, but maybe someone will bring it in another case, is

17    whether one company who's not mentioned in a lead call can

18    then be liable for a pre-record when that company is not

19    mentioned and it's actually not even determined that that

20    company might even have a product worth selling until it

21    gets to the actual agent, until that initial robo call or

22    pre-record is transferred to someone else.

23             Now, there's no question that there's a vicarious

24    liability or that vicarious liability is a good-faith

25    allegation that can be made and has been made in this case,

1   but it then comes down to whether or not who actually caused

2   the injury and whether or not you can settle with one

3   plaintiff -- or one defendant even though there may have

4   been seven different companies that were potentially to be

5   offered in a call that did not mention any company names

6   whatsoever.

7         And while the law is still developing in those

8   areas, both of the parties looked and said, "Hey, it might

9   get worse, it might get better on what that law looks like,

10   either better for the defendant or better for the plaintiff.

11   Let's go ahead and end that question because of how distinct

12   this is."

13         And this is very distinct from other cases where

14   you have direct groups or maybe one or two layers between

15   the folks that are asking for the calls or being -- sought

16   to be liable such as Agentra and the underlying agents.

17         But, again, from the intent of what we have put

18   together, is that it reasonably is tailored to the class,

19   even though it is distinct; and I will acknowledge that

20   distinction, as well, and then the reality of what the

21   evidence would show, because of the fact that whether a

22   third caller -- whether there was a call from a lead

23   generator in Panama who offered generic health insurance and

24   then transferred that call to an agent in the United States

25   is something that is going to be a problem.

```
1          And really, I think it's the problem that
2   Mr. Peluso is seeking to avoid by moving into this
3   settlement, is a problem that he hasn't yet crossed and
4   hasn't had to yet, but will cross in the Abboud case.
5              THE COURT:  And do you agree that the release in
6   the settlement agreement only releases those approximately
7   19,000 who -- releases you from liability for the
8   approximate 19,000 or so individuals to whom a notice was
9   successfully delivered?
10             MR. RICHMOND:  Yes.
11             THE COURT:  Okay.  And I know that Mr. Paronich
12  mentioned a willingness to either revise the settlement
13  agreement or perhaps -- and he didn't say this.  This is my
14  wording -- wordsmith how the class is described.  Is that
15  something that you believe is possible, would be appropriate
16  here, or that you would object to?
17             MR. RICHMOND:  Well, Your Honor, I think it has to
18  come down to the question of what the extent of that is and
19  to the degree.  To the extent that we take very seriously
20  the Court's ruling that a settlement was reached -- and so
21  to the extent that that's merely clarifying what's already
22  there, then I believe in the spirit of trying to get this
23  case moved forward and get relief for these folks and just
24  let everyone move forward, then there's a certain -- a
25  boundary in which we're just simply being clear as opposed
```

1   to changing.  I would have to reserve the right to further

2   object to both procedure and substance if it gets beyond

3   that.

4            THE COURT:  Oh, I understand.  And I'm not asking

5   you to commit to anything on that score today.  I just want

6   to make sure that if there is some -- if there is some minor

7   clarification that needs to be accomplished, that we have a

8   framework to do it.

9            Let me ask both Mr. Richmond and Mr. Paronich, if,

10  and I am saying if, there was a minor clarification to the

11  description of the class to make it more clear that the

12  class consists of individuals who purchased a policy, would

13  there have to be another round of notices to the same group

14  that have already received notice and either responded,

15  opted out, or not responded at all?

16           MR. PARONICH:  I'll take that first, Your Honor,

17  for the plaintiffs.  Actually, since we've been talking, I

18  have the settlement agreement in front of me; and I see the

19  language regarding the sale of and the class definition.

20  And if that was revised or removed and inserted instead,

21  "and sold," I think that accomplishes this.  I think it's

22  consistent with the parties' intention.

23           And to segue to your point, as I think the case law

24  is pretty clear, that if we were expanding the relief that

25  Agentra was getting or the amount of class members, we are

1    under an obligation to send notice.  But if we are keeping

2    the same or restricting that and the class members in that

3    way get more and Agentra gets less, here, I think it's clear

4    we're keeping the same, then no further notice is required.

5            THE COURT:  Thank you, Mr. Paronich.

6    Mr. Richmond, anything you wanted to add on that score?

7            MR. RICHMOND:  No.  I believe that's consistent

8    with my experience in other class cases, is that if there

9    are -- especially if it's just a clarification and/or

10   keeping it to an understood narrower relief, if there's a

11   whiff of more relief is being granted without notice, that's

12   where we would need to kind of belt and suspenders.

13           THE COURT:  Okay.  Mr. Richmond, I want to go back

14   to the settlement agreement, because in Paragraph 4, and

15   this is 4(a)(3), and I believe it's Page 5 of the settlement

16   agreement, there's a reference to the settling defendant

17   providing a declaration regarding financial hardship.

18           I know that we've had some discussion here today

19   and also in the briefing about the financial documents that

20   were exchanged and the willingness to provide those to me in

21   camera, which I would like to receive; and we can talk about

22   that at the end of this proceeding.  Have you prepared that

23   declaration, and are you intending to do so if you have not?

24           MR. RICHMOND:  I don't believe we have, but we are

25   intending to do it without question.  And just to jump to

1  the end, there is no objection for an in-camera review.  I

2  don't even know if we could object.  But we aren't going to

3  object to an in-camera review of the financial information.

4  The identical information was provided to Mr. Peluso and to

5  Mr. Paronich separately and then, you know, as part of

6  leading up to this hearing.  So certainly happy to jump

7  through the hoops necessary to get that done.

8          THE COURT:  Okay.  So I would appreciate that, and

9  we can talk a little bit later about how this is done.  But

10  I would like to see the documents, and I believe all of you

11  have already said, both in your papers and here today, that

12  there's no objection to providing them for an in-camera

13  review.

14          But, Mr. Richmond, I think you also need to comply

15  with that section of the agreement by providing that

16  declaration.  And that, of course, can be maintained under

17  seal as indicated there.  But if you can take care of that,

18  I think that would be appropriate.

19          I also want to make sure, finally, Mr. Richmond, I

20  understand your position, that I understand there is a

21  provision, I believe, in the settlement agreement about

22  opt-outs and what happens if someone opts out.  And I want

23  to make sure I understand what your position is on that,

24  because I know there is a no-opt-out provision in there.  I

25  assume you're reserving your rights with respect to that if

```
 1    I were to allow Ms. Abboud to opt out.
 2              MR. RICHMOND:  Correct.
 3              THE COURT:  All right.  I also have some questions
 4    for you, Mr. Peluso.  Thank you, Mr. Richmond.  I know that,
 5    Mr. Peluso, I don't have any doubt that you were not aware
 6    of the existence of this lawsuit, according to what you've
 7    said in your papers.  Do you have any reason to doubt that
 8    someone else, either prior or referral counsel, did, in
 9    fact, contact Mr. Paronich as early as November of 2018?
10              MR. PELUSO:  So I haven't inquired about it, but I
11    don't have any reason to doubt that what Mr. Paronich is
12    saying is not true.  It wouldn't surprise me.  Mr. Paronich
13    and I actually have a relationship, I think, with the same
14    referral counsel.  So it would not surprise me if, you know,
15    Mr. Paronich was approached before I was approached; but I
16    don't have any knowledge of that.
17              THE COURT:  Okay.  That's fine.  I just wanted to
18    make sure I understood your position on that.
19              MR. PELUSO:  But I do think -- just to clarify
20    there on the timeline of this, I think, you know, I -- we
21    found out in January or so when -- I think it was
22    Mr. Richmond's associate, Andrew Lynn, who first let me know
23    about this case.
24              It's true that we didn't seek to intervene until
25    October.  But, you know, the timeline of it is I think it's
```

1  April or so that there's a notice of settlement in this

2  case.  There's no details of exactly what is being settled.

3        And that's the only reason -- I don't dispute what

4  Mr. Paronich said, that he has the right to settle a class

5  that doesn't match up with the class that he has pled.  We

6  only brought that up simply for the point that, you know, a

7  class is settled when the notice of settlement is filed.

8  There's no details about what exactly is being settled.  And

9  then when you look at the Amended Complaint, the claims

10 don't match up with what we had.  So at that point, what are

11 we intervening for?

12       And also, at that point, our classes had not been

13 certified yet.  So that didn't happen until September.  I

14 didn't have this fiduciary duty at that point to this group

15 of people to jump in and make sure that this settlement is

16 fair, reasonable, and adequate.  That didn't happen until

17 September.  And then as October rolls around and my client

18 receives notice of the settlement in this class, that's when

19 we chose to intervene.

20       So I just wanted to provide a little bit more

21 background on the delay there, I guess, between January and

22 October.  It wasn't really until the latter end of the year

23 that our class was certified and that it was clear, because

24 Abboud received notice, that she was included in this

25 settlement, anyway.

```
 1          THE COURT:  No.  I appreciate that.  Thank you.
 2   Now, just to make sure I understand your objection, is it to
 3   the entire class, some subset of the class?  I know that you
 4   have as certified a text class and an agent class.  Are we
 5   only here talking about an issue with respect to your agent
 6   class, or does it encompass both?
 7          MR. PELUSO:  That's correct.  I don't think it
 8   encompasses the text class at all.  And the agent class, we
 9   have -- our agent class is limited to people who were called
10   by two agents, and those two are part of this group of nine
11   or ten that are included in this settlement class.  So,
12   yeah, we have the fiduciary duty to people who were called
13   by a subset of this settlement class.
14          THE COURT:  Got it.  Okay.  So the text class,
15   we're not talking about at all here?
16          MR. PELUSO:  No.
17          THE COURT:  Does the agent class include both
18   people who purchased policies and people who did not?
19          MR. PELUSO:  Yeah.  As defined, it's just persons
20   who were called by these two agents for the purpose of
21   promoting Agentra's insurance product or that could have
22   resulted in the purchase of Agentra's insurance product.  So
23   I think it includes that broader universe, yes.
24          THE COURT:  And I'm assuming Ms. Abboud purchased
25   a policy.
```

```
 1              MR. PELUSO:  Yeah.  There was some -- she did do
 2   what Mr. Paronich said that his clients did, play along to
 3   try to figure out what was happening.  There was some
 4   discussion at the 30(b)(6) deposition of Agentra that she
 5   essentially had been signed up by accident.  Her credit card
 6   was charged, but it wasn't supposed to be charged.  Either
 7   way, she received a notice.  So she was signed up.  She
 8   received a notice.  She apparently appears on the settlement
 9   class list here.
10              THE COURT:  Okay.  Understood.  And describe for
11   me, if you could, and perhaps we've already touched on this
12   a fair deal, what is the overlap between the settlement of
13   this case and how it impacts your case?  Is it just limited,
14   as we've talked about, to the two agents who have been
15   identified within the agent class?  Is that essentially the
16   overlap?
17              MR. PELUSO:  That's correct, Your Honor.
18              THE COURT:  I don't want to hold you to that.  I
19   mean, feel free to expand on that.
20              MR. PELUSO:  No.  I think that's an accurate
21   representation, Your Honor.  We represent a subset of the
22   people at issue here, have a fiduciary duty to them,
23   reviewed the same financial documents that were provided at
24   the -- you know, we had a mediation in our case.
25   Mr. Paronich had a mediation in this case.
```

1      We received the same financial documents.  We found

2  them to be completely inadequate to evaluate the financial

3  condition of this company.  We have a duty as class counsel

4  to these people, and that's why we intervened and objected.

5          THE COURT:  Understood.  And do you want to say

6  anything further about why you believe this settlement is

7  unfair, unreasonable, inadequate?  I know you've already

8  talked about it in your papers and here today, but I want to

9  give you any further opportunity based on what counsel for

10 the parties have already said.

11         MR. PELUSO:  No, Your Honor.  The only other thing

12 I would add, Mr. Paronich earlier was talking about the

13 statutory damages.  And that's correct.  I would just make

14 the point that it's $500 per call.  Right.  So if a person

15 receives 5 calls, it's not $500, it's $2,500.

16         So to the point that, you know, claimants here

17 apparently are receiving $48 or $49, you know, that seems to

18 be -- it doesn't account for how many calls they may have

19 received.  So someone may have a claim for three calls and

20 they're only getting $48.  I would just simply suggest that

21 as the financial documents Your Honor plans to review will

22 show, this defendant could pay more than they're paying

23 here.

24         THE COURT:  All right.  I appreciate that.  I need

25 to take just a quick five-minute break.  I believe we're

1  about done.  I have one matter I have to attend to.  It will

2  only take five minutes.  So if you can all bear with me.

3  Feel free to come back in five minutes on the conference,

4  and I believe we're close to being done.  So we'll see you

5  back here in five minutes.

6          MR. PARONICH:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8      (Recess taken.)

9          THE COURT:  Thanks, everyone, for allowing me to

10 take that quick break.  Mr. Paronich, is there anything else

11 that you want to address with respect to the requirements

12 under Rule 23(a)?  I believe that much of that has been

13 covered already through both affidavits and written

14 submissions.  But is there anything else you feel you need

15 to address about those four factors?

16         MR. PARONICH:  There is not, Your Honor.  I have a

17 couple of other quick points to address, but I'll wait for a

18 more appropriate time if --

19         THE COURT:  Now is a good time.

20         MR. PARONICH:  So I think there were a couple of

21 issues I wanted to -- and one was to clarify, because our

22 position would have been different.  Mr. Peluso, I don't

23 doubt that he did not -- he was unaware that his client,

24 through a referring attorney, had approached me, because,

25 frankly, if we thought that was true, we would have taken a

1  more aggressive position about it.  So I wanted to make that

2  clear.

3        The second issue is that Your Honor had raised to

4  Agentra's counsel about the lack of ability for opt-outs,

5  which does get discussed in Agentra's response to the

6  objections; but I wanted to clarify my understanding under

7  the settlement agreement, that that's a prohibition against

8  mass opt-outs.

9        So if Ms. Abboud, herself, opts out to pursue her

10  claims with the certified classes, I don't think there is a

11  tenable argument that that would be a violation of the

12  agreement.  But, again, of course, that's distinct from a

13  mass opt-out.

14        And Your Honor may anticipate describing this, but

15  I think it would be helpful to understand, Your Honor will

16  certainly be taking a look in camera at the financials that

17  were provided to us.  But also understanding any other

18  detailed financial information, which is what's required, I

19  think it could aid the Court in making its determination

20  about what else Agentra should be submitting for the Court

21  to review.

22        But with respect to that financial condition, I

23  don't want to re-emphasize, I'll just simply state again

24  that the fact that Agentra could potentially pay more money

25  with a judgment against it versus the strengths and

weaknesses of this case was a big deciding factor for us;
and it's why, out of all the TCPA settlements out there that
had been approved, what we provided in our string cite was
Capital One, Bank of America, Wells Fargo, and entities like
that, because there is no issue of their financial ability
to pay with the settlement.  It's just we're always about --
we're comparing that to the strengths and weaknesses and the
stage of the litigation.

          And my final point does relate to Mr. Peluso's
comment that I agree with, that is $500 per call.  Here,
when we're defining our class, just based on the policies
purchased, we don't have the records of the amount of calls
the individuals received.  So with respect to our, I
believe, 23(b) obligation to treat all class members fairly,
what we did is if individuals had multiple purchases, which
could happen through multiple investigations into what they
would allege are illegal calls, and they had multiple phone
numbers, we're paying them once per phone number.  And that
is a distinction, frankly, from a number of other of the
Capital One, Bank of America, Wells Fargo settlements.

          And having known from being a part of some of those
other cases, it's a situation where if you hire a debt
collector and they're trying to collect on a credit card
debt, you know, it's, frankly, a little stomach-churning how
many calls can be made there.

```
 1          And here, while I don't have any reason to
 2  believe -- and it doesn't make logical sense that a
 3  solicitation call -- if they're being told, "I'm not
 4  interested" or "no," they should move on.  I'm not saying
 5  they always do.
 6          But here, I just don't think there's the kind of
 7  volume that would warrant concern about how the money is
 8  being distributed here, because we have taken into account
 9  if they have more than one number called, they're going to
10  get a pro rata share.  And those are all my notes,
11  Your Honor.  Thank you.
12          THE COURT:  Thank you.  Mr. Richmond, do you want
13  to add anything either to what Mr. Paronich has just talked
14  about or anything else that you believe is helpful before we
15  conclude?
16          MR. RICHMOND:  I would just say that the flip side
17  of the question of could you squeeze more pennies on a
18  settlement out of a particular party based on saying, well,
19  it looks like these financials show you have a little bit
20  more money, you could -- and I don't know whether the Court
21  is going to look at that and decide -- I don't think the
22  Court is going to conclude that when the Court looks at the
23  financials.  But that certainly has to be countered against
24  the question and really the lack of any evidence or even
25  substantive argument by Mr. Peluso that there has been a
```

1  misevaluation of the vicarious liability issues in this

2  particular case or the ability to be able to prove up that

3  these calls took place, who they were on behalf of, how they

4  got transferred, how many occurred.  And those are

5  substantial questions.

6          So, you know, could I squeeze out some more summary

7  judgment wins and they could squeeze out some more dollars

8  in settlement?  Potentially.  But I know the Court will

9  weigh all of those options, and I think there's certainly

10 no -- the Court will only be aided by seeing the financials

11 and taking those in the context of this particular

12 settlement.  If the result is that I get to go further

13 vindicate my client through further litigation in this case,

14 so be it.

15          THE COURT:  Okay.  Thank you, Mr. Richmond.

16 Mr. Peluso, anything else that you would like to add?

17          MR. PELUSO:  Yeah.  Just two points really

18 quickly.  One, I agree with what Mr. Paronich said about

19 opt-outs.  We obviously took a look at the agreement.  I

20 understand that there's a provision against mass opt-outs.

21 Currently, individuals have to have the opportunity to opt

22 out.  It would violate due process if a class settlement was

23 agreed to and you didn't have the opportunity to opt out of

24 it.  So, you know, I agree there.

25          On this vicarious liability question and, you know,

1  the fact that -- this argument that the case is properly

2  valued and it doesn't really matter if Agentra could pay

3  more, you know, I would just point out again, you know, that

4  we're talking about this settlement fund being roughly

5  three percent of the available recovery just if each person

6  received one call.

7         To say that Mr. Paronich only has a three-percent

8  chance of convincing the Court that Agentra could be

9  vicariously liable I think undersells Mr. Paronich's skill.

10  I think that it's a low recovery relative to the available

11  amount.  I'm certainly not saying that a settlement has to

12  be for 500 times the number of calls.  I mean, that's not

13  the purpose of settlement.  Right?  There's risk on both

14  sides, parties come together, they compromise.  I understand

15  all of that.

16         I'm simply suggesting that the settlement here is

17  too low given the potential recovery.  Even considering the

18  opportunity likelihood of success on the merits, it's

19  certainly greater than three percent.  And this is not a

20  company that would be bankrupt by paying more.  So with

21  that, I thank Your Honor very much for allowing me to

22  appear.

23         THE COURT:  Of course.  And I assume regardless of

24  my ruling, Ms. Abboud is opting out of this settlement?

25         MR. PELUSO:  Correct, Your Honor.  There was a

1  little bit of debate, frankly, on our end about whether to

2  opt out before objecting, that perhaps if you opted out, you

3  lost the right to object.  So certainly, if the objection is

4  not sustained, then we will be opting out.

5          THE COURT:  Okay.  I just wanted to make sure I

6  understood that.  I assumed that that was the case, but

7  thank you for that clarification.  Anything else before we

8  turn to how the financial documents are going to be

9  conveyed?

10          MR. PARONICH:  Is that for anyone, Your Honor, or

11  just for Mr. Peluso?

12          THE COURT:  Anyone.

13          MR. PARONICH:  Just very briefly, Your Honor, I

14  appreciate Mr. Peluso's sentiment.  What I would say is that

15  on the number of calls, on the likelihood of success,

16  because we are also evaluating vicarious liability factors,

17  which there's no overlap with one of Mr. Peluso's classes,

18  it seems like he doesn't have that present.

19          So he'll be able to pursue a case that doesn't have

20  the vicarious -- the same vicarious liability issues, I

21  should say, that are present here.  And it's why that

22  3.7 percent number -- I mean, frankly, it's effective

23  advocacy to use it, because it sounds low.  But then that's

24  why we provided the string cite of the range of reasonable

25  settlements in this district circuit and otherwise,

1    including Judge Kearney at 0.9 percent, because the

2    statutory damages are -- we believe that they are

3    appropriate, but we also recognize that they're severe.

4    Thank you.

5             THE COURT:  Mr. Paronich, I'm just curious, in a

6    case like this, maybe you can review for me how you would

7    prove that calls were made.  Are you looking at the

8    telephone records of members of the class?  Are you looking

9    or trying to discover telephone records from the subvendors,

10   vendors, those sorts of folks; and how difficult or not is

11   that?

12            MR. PARONICH:  The bane of my existence,

13   Your Honor.  So it is the -- because you're exactly right.

14   If you have a direct liability case, you have the ability to

15   request first-party discovery, I would like the calling

16   records.  A defendant will object precertification nine

17   times out of ten.

18            With a vicarious liability case, you have to start

19   with the policy purchase.  You approach the defendant in

20   their Rule 26 disclosures or -- because they're often

21   saying, "Well, that's not relevant to our defense," in the

22   first party discovery, "Who sold the policy?"  We did that

23   here.  We amended our complaint and named those individuals.

24            They'll default.  They defaulted here.  Actually,

25   there was a default, there was an appearance, a removal.  It

1  was kind a mess.  So that will happen.  You'll then approach

2  that party through first-party discovery and say, "Where did

3  the individuals' lead come from?"  They identified that

4  vendor.

5       We then go and subpoena that vendor who, if they're

6  in the U.S., and often they're not, they'll say, "Oh, well,

7  you know, we hired Tom's Leads in order to generate that

8  lead.  We don't have Tom's Leads' contact information," or,

9  "Here is their contact information."

10      And if that party is in the U.S., you then issue

11 them a subpoena, and so it goes.  Here, we did all of that,

12 got to the Tom's Leads entity, found out that they were

13 getting leads from, I believe, overseas, but also this one

14 individual in Texas, went to this individual in Texas,

15 issued a subpoena, had it ignored, and then went in to file

16 an enforcement action, was able to negotiate getting these

17 calling records, got an affidavit so we could authenticate

18 them, and then started again, in earnest, in terms of --

19 from a litigation strategy perspective, how are we going to

20 prove Agentra's vicarious liability with this five degrees

21 of separation.

22      And then to take a look at the settlement that we

23 had here and to think about how could we -- because there's

24 no doubt that this is not the amount of money that a lot of

25 our settlements are for or -- and I can't speak to the rest

1  of the TCPA bar, but it's certainly -- you know, I guess the

2  proof is on PACER now.

3          The lodestar we're seeking here, it's 50 percent of

4  what we put into the case or roughly 50 to 60 percent.  And

5  the reality is that we didn't see a viable -- and I kind of

6  still don't see a viable path forward of starting with those

7  call logs, leading them all the way back to certifying our

8  class.

9          So instead, we wanted to take -- we approached

10  Agentra with if we can limit this release and limit this

11  class to individuals you got the benefit for, that's how we

12  put together the class list.

13          THE COURT:  Thank you.  I appreciate that.

14  Mr. Richmond, with respect to the financial documents that

15  have been discussed both before today and today, what I

16  would like you to do with respect to those is if you're

17  comfortable sending them by e-mail to my courtroom deputy,

18  she will make sure they get to me; and we will ensure that

19  they are kept confidential, and I'll review them in camera.

20          You can give some thought to how you want to handle

21  your declaration that's referenced in the settlement

22  agreement.  But just a reminder that just to accomplish the

23  purposes of the settlement agreement, that needs to be done,

24  as well.

25          If you're not comfortable sending any confidential

1   documents by e-mail, you can certainly send them in another

2   way, and I'll get them.  So I don't want you to feel any

3   concern that if you do it in that way, it heightens any

4   concern that you might have.  So what is your preference on

5   these issues?

6              MR. RICHMOND:  I would trust the court's e-mail

7   system.  So I have no problem there.  I did -- just so there

8   is a record somewhere, I had intended to file a notice.  So

9   I will Bates label those records.  I'll share them, of

10  course, again, with Mr. Peluso and Mr. Paronich so they

11  know.  You know, and I'll just put a label on there that

12  these are being submitted for an in-camera review and then

13  file a one-sentence notice in the court's records that we

14  submitted those.

15             So that way, if these records are identified

16  somewhere in your office or subsequently that folks -- there

17  will be some record in the system and on PACER to reflect,

18  and it will just say these Bates labels were submitted today

19  by e-mail to this address for in camera and confidential

20  review.

21             THE COURT:  That's fine with me.  And I think you

22  have Ms. Eckenrode's e-mail address.  I know she reached out

23  to everyone with the information for today's conference.

24  But feel free to call us if you need any further help there.

25  Is there anything else that anyone wanted to address or

1  raise during this proceeding?

2        MR. PARONICH:  Not for the plaintiff, Your Honor.

3  Thank you.

4        MR. RICHMOND:  Nothing for Agentra, Your Honor.

5        MR. PELUSO:  Nothing from me, either, Your Honor.

6        THE COURT:  All right.  Well, I'm going to take

7  all of this under advisement.  I'll wait to get those

8  financial documents.  Let me ask before we conclude -- I

9  never want to foreclose anyone's final opportunity to submit

10  a brief.  Is there anyone who feels there's any issue that

11  needs to be briefed before I review this and make my

12  decision?

13        MR. PARONICH:  Not for the plaintiffs, Your Honor.

14        THE COURT:  All right.  Mr. Richmond?

15        MR. RICHMOND:  No, Your Honor.

16        THE COURT:  Mr. Peluso?

17        MR. PELUSO:  No.

18        THE COURT:  All right.  Well, I'm sure you're not

19  unhappy to say that you don't have to brief anything more on

20  this.  I very much appreciate your efforts here today.  It

21  was very helpful to me.  So with that, we're concluded for

22  today.  And if I have any additional questions or feel that

23  we need a further call, I'll certainly let you know about

24  that.  But otherwise, thank you.  That concludes our

25  proceeding here today.

1          MR. PELUSO:  Thank you, Your Honor.

2          MR. RICHMOND:   Thank you, Your Honor.

3      (Court adjourned.)

4

5

6                    C E R T I F I C A T E

7          I, Amanda M. Williamson, certify that the foregoing

8  is a correct transcript from the record of proceedings in

9  the above-titled matter.

10  S/Amanda M. Williamson  _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25